1  Christopher F. Wohl, SBN: 170280
   Treaver K. Hodson, SBN: 179184
2  Jennifer L. McQuarrie, SBN: 191730
   PALMER KAZANJIAN WOHL PERKINS, LLP
3  520 Capitol Mall, Suite 600
   Sacramento, CA 95814
4  Telephone:   (916) 442-3552
   Facsimile:   (916) 442-3606
5
   Attorneys for Defendant and
6  Cross-Claimant LETITIA RUITER

7                    UNITED STATES DISTRICT COURT

8                   EASTERN DISTRICT OF CALIFORNIA

9
   CONTRACT ASSOCIATES OFFICE          Case No. 2:07-CV-00334-WBS-EFB
10 INTERIORS, INC.,
                                       **MEMORANDUM OF POINTS AND**
11         Plaintiff                   **AUTHORITIES IN SUPPORT OF**
                                       **DEFENDANT AND CROSS-CLAIMANT**
12     v.                              **LETITIA RUITER'S MOTION FOR**
                                       **SUMMARY JUDGMENT OR,**
13 LETITIA A. RUITER, and              **ALTERNATIVELY, SUMMARY**
   WORKSPACE SOLUTIONS, INC.,          **ADJUDICATION**
14
           Defendants.                 **Date:      June 23, 2008**
15                                     **Time:      2:00 p.m.**
                                       **Courtroom:   5**
16 And Related Cross Action
                                       **THE HONORABLE WILLIAM B. SHUBB**
17

18

19

20

21

22

23

24

25

26

27

28

I.  INTRODUCTION ............................................................................................ 2
II. STATEMENT OF FACTS .............................................................................. 3
   A.  Ruiter's Employment with Contract Associates ...................................... 3
   B.  E*Trade Follows Ruiter to Workspace Solutions ................................... 7
III. ARGUMENT .................................................................................................. 9
   A.  Standard of Review ................................................................................. 9
   B.  Contract Associates Fails to Establish a Violation of the Computer
       Fraud and Abuse Act ............................................................................ 10
   C.  Contract Associates Cannot Establish a Prima Facie Case That Ruiter
       Breached any Contracts ......................................................................... 12
       1.  Ruiter's alleged breach did not damage Contract Associates ......... 13
       2.  Contract Associates' Alleged Contract Damages Are
           Speculative ................................................................................... 14
   D.  Summary Adjudication on Contract Associates' Breach of the Implied
       Covenant of Good Faith and Fair Dealing is Appropriate .................... 15
       1.  Tort Damages are Not Available to Contract Associates for an
           Alleged Breach of the Implied Covenant of Good Faith and
           Fair Dealing .................................................................................. 15
       2.  Ruiter Did not Breach the Implied Covenant of Good Faith and
           Fair Dealing .................................................................................. 17
   E.  Contract Associates' Count for Breach of Duty of Loyalty Must Fail .... 19
   F.  Ruiter did not Tortiously Interfere with an Economic Relationship or
       Prospective Economic Advantage between Contract Associates and
       E*Trade .................................................................................................. 20
   G.  Contract Associates' Claim for Conversion Fails because Contract
       Associates had no Property Interest in the Five E*Trade Projects ......... 21
   H.  Ruiter's Allegedly Deceitful Conduct did not Damage Contract
       Associates ............................................................................................... 22
   I.  Summary Adjudication is Proper on Contract Associates' Claim for
       Unfair Competition ................................................................................. 23
IV. CONCLUSION ................................................................................................ 25

## CASES

*Ashton-Tate Corp. v. Ross*, 728 F. Supp. 597, 604 (N.D. Cal. 1989) ................................ 15

*Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 346 (1966) .......................................... 19

*Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) ................................ 23

*Calderone v. United States, supra*, 799 F2d at 259 ..................................................... 10

*Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935-36 (9th Cir. 2004 ........... 11

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995) ................ 20

*EPIS, Inc. v. Fidelity and Guaranty Life Ins. Co.*, 156 F. Supp. 2d 1116, 1127 (N.D. Cal. 2001) ......................................................................................................... 13

*Fischer v. Machado*, 50 Cal. App. 4th 1069, 1072 (1996 ........................................... 21

*Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988) .............................................. 15

*Hansen v. U.S.*, 7 F.3d 137, 138 (9th Cir. 1993) ...................................................... 11

*Hill v. Wrather*, 158 Cal. App. 2d 818, 824 (1958) .................................................. 22

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003)) .......... 22, 23

*Love v. Motion Industries, Inc.*, 309 F. Supp. 2d 1128, 1135 (N.D. Cal. 2004) ............. 13

*National Medical Transportation Network v. Deloitte & Touche* ............................... 14, 18

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 384, 395 (2007) ................................................................................. 21

*Poppell v. City of San Diego*, 149 F.3d 951, 954 (9th Cir. 1998) ............................. 12, 14

*San Jose Construction, Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1545 (2007) ......... 20

*Sebastian Intern., Inc. v. Russolillo*, 2005 WL 1323127, *9 (C.D. Cal. ................... 12, 14

*Settimo Associates v. Environ Systems, Inc.*, 14 Cal. App. 4th 842, 845 (1993) .............. 20

*Southern Calif. Gas Co. v. City of Santa Ana, supra* 336 F3d at 888 .......................... 10

*Tarin v. County of Los Angeles*, 123 F.3d 1259, 1265 (9th Cir. 1997 ......................... 11

*Thompson Pacific Const., Inc. v. City of Sunnyvale*, 155 Cal. App. 4th 525, 541 (2007) ........... 17

*US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (2005)) ..................... 13, 14, 17, 18

*Westside Center Associates v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521-22 (1996) ................................................................................................................... 20

*Williams v. Wraxall*, 33 Cal. App. 4th 120, 131-32 (1995)) ..................................... 22

*Wiz Technology, Inc. v. Coopers & Lybrand*, 106 Cal. App. 4th 1, 15 (2003) ................ 14

## STATUTES

18 U.S.C. § 1030(a)(5)(B)(i), incorporating subsection 1030(a)(5)(A)(iii) ............... 10, 11

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 .................................................. 10

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

I.     **INTRODUCTION**

Defendant and Cross-Claimant Letitia A. Ruiter (hereinafter "Ruiter"), submits this memorandum of points and authorities in support of her Motion for Summary Judgment or alternatively, Summary Adjudication, on the following claims alleged in Plaintiff Contract Associates Office Interior's ("Contract Associates") Complaint: 1) Violation of Computer Fraud and Abuse Act (18 USCA sec. 1030); 2) Breach of Contract; 3) Breach of the Implied Covenant of Good Faith and Fair Dealing; 4) Breach of Duty of Loyalty; 5) Tortious Interference with Prospective Economic Relationship and Economic Advantage; 6) Conversion; 7) Deceit; and 8) Unfair Competition.[1]

Contract Associates is a small office furniture supplier and commercial space designer. Ruiter started her employment as an "at-will" employee with Contract Associates in 2003 as a project manager/project designer. Ruiter resigned from Contract Associates in September 2006, and began working for another furniture supplier and space designer – Defendant Workspace Solutions. To the displeasure of Contract Associates, Ruiter's largest client E*Trade, followed her to Workspace Solutions, which Contract Associates concedes was E*Trade's choice. It is undisputed that E*Trade decided to stop doing business with Contract Associates in September 2006 and it is also undisputed that E*Trade only wanted Ruiter to work on these five projects (and all E*Trade projects) irrespective of where she worked.

Contract Associates filed this action claiming an entitlement to commissions from five E*Trade projects that, according to Contract Associates' own Commission Agreement, are not allowed because (as Contract Associates concedes) no purchase orders were generated on these five projects and no monies were paid by E*Trade to Contract Associates. Signed purchase orders and payment by E*Trade to Contract Associates were conditions precedent to commission earnings and therefore Contract Associates is not entitled to commissions on the five E*Trade projects that are the subject of its Complaint.

///

---

[1]Contract Associates' claim for Tortious Interference with Contract (Sixth Cause of Action) is only alleged against Defendant Workspace Solutions.

PALMER KAZANJIAN
WOHL PERKINS LLP
520 Capitol Mall, Suite 600
Sacramento, CA 95814
916.442.3552

1   As more fully set forth below, Ruiter's Motion for Summary Judgment or alternatively,

2   Summary Adjudication should be granted.

3   ## II.    STATEMENT OF FACTS

4   ### A.    Ruiter's Employment with Contract Associates.

5   Contract Associates is an office furniture supplier that also provides space planning, and

6   project management services. Contract Associates was started by Bob Antonelli about 18 years ago.

7   Bob Antonelli's wife, Ann Antonelli, began working at Contract Associates approximately five

8   years after it opened. Bob and Ann Antonelli are Contract Associates' sole shareholders, officers

9   and directors. Including Bob and Ann Antonelli, Contract Associates has never employed more than

10  three or four employees. (Separate Statement of Undisputed Fact ["SSUF"] No. 1) Bob Antonelli is

11  responsible for the "operation" of Contract Associates while Mrs. Antonelli handles bookkeeping

12  and other "administrative" matters, typically while working from her home. (SSUF No. 2)

13  Ruiter graduated from San Jose State University in 1990 with a degree in interior design and

14  a minor in energy resource management. From 1990 to the present Ruiter has worked as a project

15  manager and project designer in the commercial office design field. Ruiter moved to Sacramento in

16  2003 and interviewed with Mr. and Mrs. Antonelli. Ruiter was hired as a sales associate/project

17  designer by Contract Associates in July 2003. Ruiter's employment was "at will"--Contract

18  Associates and Ruiter understood that either could terminate the employment relationship at any

19  time and for any lawful reason with or without notice. (SSUF No. 3)

20  In 2005, E*Trade Facility Manager Jeff Burdian, who was working in the bay area, needed a

21  Sacramento space planner to assist with a "reconfiguration" of E*Trade's Rancho Cordova facility.

22  Notably, E*Trade had never been a customer of Contract Associates prior to 2005. Mr. Burdian

23  found Contract Associates in the phone book and he called and left a voicemail message. Ruiter and

24  Bob Antonelli returned Mr. Burdian's call and a face-to-face meeting was set up. (SSUF No. 4)

25  Ruiter, Mr. Burdian, Mr. Antonelli, and an installation contractor thereafter met to discuss

26  the proposed E*Trade reconfiguration in Rancho Cordova. The meeting went well and Mr. Burdian

27  reported back to his direct supervisor Thomas Gaffney, E*Trade's Assistant Director of Corporate

28  Facilities. Messrs. Gaffney and Burdian awarded the Rancho Cordova project to Contract

1   Associates. Ruiter immediately got to work and prepared all of the reconfigurations for this project

2   by using a computer aided design (i.e., "CAD") system (SSUF No. 5) Messrs Burdian and Gaffney

3   only dealt with Ruiter and never had any contact with Mr. or Mrs. Antonelli. (SSUF No. 6)

4         Messrs. Burdian and Gaffney were extremely pleased with Ruiter's performance on the

5   Rancho Cordova project. Mr. Gaffney had the authority to award E*Trade projects nationwide and,

6   based on Ruiter's successful reconfiguration in Rancho Cordova, E*Trade gave Contract Associates

7   and Ruiter a more profitable "installation" job at E*Trade's San Ramon, California location. (SSUF

8   No. 7)

9         Ruiter did all of the design and space planning work on the E*Trade San Ramon installation

10  project. Ruiter also coordinated the purchase of furniture from Teknion -- Teknion is a "systems"

11  furniture manufacturer that Ruiter had worked with prior to her employment with Contract

12  Associates. Contract Associates was also an authorized Teknion dealer. (SSUF No. 8)  During the

13  San Ramon project Mr. Gaffney never met with Mr. or Mrs. Antonelli.  Similar to the Rancho

14  Cordova job, Mr. Gaffney dealt exclusively with Ruiter. (SSUF No. 9)

15        Mr. Gaffney was pleased with Ruiter's performance in San Ramon and Mr. Gaffney's

16  favorable opinion of Ruiter's work led to more projects, including E*Trade projects outside of

17  California. (SSUF No. 10)  As Ruiter's workload increased, however, she was not getting the

18  commensurate assistance that she needed from Contract Associates.  For example, Ruiter needed

19  help with ordering, preparing specifications, and tracking but neither Bob nor Ann Antonelli

20  provided any assistance. (SSUF No. 11)  In the furniture sales industry, there is typically a "team"

21  that consists of a salesperson, a project manager, and a designer.  At Contract Associates Ruiter was

22  performing all three jobs without any support.   E*Trade, Teknion and others were aware that

23  Contract Associates was not giving Ruiter enough help and they thought it was a problem (SSUF

24  No. 12)

25        Contract Associates' refusal to hire someone to help Ruiter caused Teknion's Kathie

26  Schwartz to help Ruiter on the E*Trade's projects.  Ms. Schwartz assisted Ruiter with tasks such as

27  checking billing material, merchandising product, attending conference calls, and coordinating

28  purchases with the factory, something that was the responsibility of the sales associate/dealer, not the

1   furniture supplier. (SSUF No. 13) Teknion was so concerned about Contract Associates' failure to
2   support Ruiter that Bob and Ann Antonelli were summoned to attend a "dealer-review" meeting with
3   Teknion management. (SSUF No. 14) Contract Associates, however, ignored the "lack of support"
4   criticism and refused to hire additional personnel. (SSUF No. 15)

5       In May 2006, rather than hire someone to help Ruiter, Contract Associates instead attempted
6   to keep Ruiter happy by increasing her percentage of commissions as set forth in a written
7   Commission Agreement (SSUF, Fact No. 16) The Commission Contract confirmed that Ruiter was
8   "an independent sales person" and the parties understood that Ruiter continued to be employed as an
9   "at-will" employee. Significantly, the Commission Agreement signed by the parties, confirms that
10  commission are only paid to Contract Associates and to Ruiter (1) upon a purchase order and (2)
11  when the customer (i.e. E*Trade) has paid Contract Associates in full. (SSUF No. 17) However,
12  while Ruiter appreciated the new commission split, she was still frustrated by Contract Associates'
13  failure to provide the support she needed to properly service not only E*Trade, but also her other
14  accounts. Ruiter was so frustrated that, within a few months after signing the Commission Contract,
15  she was seriously contemplating resigning from Contract Associates and working for another
16  furniture dealer. E*Trade was aware that Contract Associates was not providing Ruiter with the
17  support she needed. (SSUF No. 18)

18      Teknion also knew about Ruiter's frustrations with Contract Associates and feared Ruiter
19  would leave Contract Associates to seek employment from a "non-Teknion" dealer. Because the
20  lack of assistance at Contract Associates was getting worse and there was no help for Ruiter on the
21  horizon, Teknion tried to help Ruiter by placing her with another Teknion dealer that could provide
22  Ruiter with the support she needed. It was common for sales associates to switch from one Teknion
23  dealer to another. (SSUF No.19) Ruiter thereafter had several conversations with Teknion managers
24  about switching to a Teknion dealer that could help her. (SSUF No. 20)

25      Teknion contacted several of its authorized Bay Area dealers including Sidemark, Vanguard,
26  Interform and Workspace Solutions to determine which had the best "business model" and personnel
27  to accommodate and assist Ruiter. Teknion felt that Workspace Solutions was the best fit because,
28  unlike Contract Associates, Workspace Solutions' business model would give Ruiter the option of

1    using a project coordinator, a project designer and a list of other services that Ruiter was not getting

2    at Contract Associates. (SSUF No. 21).

3        Ruiter and Workspace Solutions' Robin Gillen spoke for the first time by telephone in July

4    2006. Ruiter told Ms. Gillen about the problems at Contract Associates and told Ms. Gillen she

5    needed help with design specifications, ordering, tracking and managing the projects. Ms. Gillen

6    confirmed that Workspace Solutions could provide the support that Ruiter needed. The commission

7    split at Workspace Solutions was also better than Ruiter was receiving at Contract Associates.

8    (SSUF No. 22)

9        In July 2006 Ruiter called E*Trade's Mr. Gaffney and Mr. Burdian to advise them that she

10   was considering leaving Contract Associates because she was not getting enough support. Mr.

11   Burdian was in favor of Ruiter leaving Contract Associates. Mr. Gaffney also thought leaving was a

12   good idea; he saw first-hand that Ruiter was overworked and "stressed out" because of the demands

13   of the E*Trade account combined with the fact that Contract Associates was not providing her with

14   any "support." Ruiter made it clear, however, that if she resigned from Contract Associates,

15   E*Trade was not obligated to follow and could give projects to Contract Associates. (SSUF No. 23)

16       In August 2006, a meeting took place at E*Trade's Rancho Cordova facility attended by

17   Teknion's Ms. Ainsle and Ms. Schwartz, E*Trade's Mr. Gaffney, Ruiter and Ms. Gillen. The

18   purpose of the meeting was to discuss Ruiter's potential move from Contract Associates to

19   Workspace Solutions. (SSUF No. 24) Mr. Gaffney was critical of Contract Associates' refusal to

20   give Ruiter help on the E*Trade's projects. Mr. Gaffney told the Teknion representatives that he

21   was concerned "about the lack of support [Ruiter] was receiving from Contract Associates." Mr.

22   Gaffney wanted Ruiter to work with a dealer that could provide her with the "tools" that Contract

23   Associates simply refused to give her. Mr. Gaffney therefore believed it was a "good idea" for

24   Ruiter to leave Contract Associates and begin working with Workspace Solutions. (SSUF No. 25)

25       On September 1, 2006, Ruiter tendered her written resignation to Contract Associates. At the

26   time of her resignation E*Trade had three projects under contract with Contract Associates, which

27   Ruiter offered to complete even after her employment with Contract Associates ended. (SSUF No.

28   26) Because these three E*Trade projects *had* signed purchase orders with Contract Associates,

1  Ruiter and Contract Associates were both entitled to receive commissions upon their completion.
2  The Commission Agreement states, and Contract Associates concedes, that unless and until a
3  purchase order is signed by the parties, no commission is owed to the dealer or the sales associate
4  even if services are performed.  Contract Associates also concedes that without a signed purchase
5  order, the client (E*Trade, for example) can give the project to any dealer it chooses. (SSUF No. 27)
6  Mr. and Mrs. Antonelli therefore accepted Ruiter's offer to complete these three jobs.  Mr. and Mrs.
7  Antonelli were able to monitor the work Ruiter performed on these three jobs because they had
8  Ruiter's computer log-on identification and password. (SSUF No. 28)  At no time was Ruiter asked
9  if E*Trade was *considering* projects other than the three currently in contract with Contract
10  Associates. (SSUF No. 29)  Ruiter completed these three projects for Contract Associates as an
11  independent contractor.  Contract Associates was fully compensated for Ruiter's work on these three
12  jobs. (SSUF No. 30)

13  **B.    E*Trade Follows Ruiter to Workspace Solutions**

14  Ruiter started her employment with Workspace Solutions on September 6, 2006.  At
15  Workspace Solutions Ruiter received the support from a "team," something she did not have at
16  Contract Associates.  Mr. Gaffney, as the authorized E*Trade representative, made the decision to
17  follow Ruiter to Workspace Solutions because of Ruiter's outstanding performance and service,
18  because Contract Associates failed to give Ruiter the support she needed to properly service
19  E*Trade, and because E*Trade wanted to continue working with another Teknion dealer such as
20  Workspace Solutions. (SSUF No. 31)

21  It is undisputed that E*Trade was free to decide who it would give business to and it is also
22  undisputed that Contract Associates had no contractual relationship with E*Trade that held the
23  promise of future business.  On a project-by-project basis, E*Trade alone decides which dealer it
24  will use for project design and furniture supply needs. (SSUF No. 32)  Contract Associates admits
25  that E*Trade never made any promises to use them exclusively and that E*Trade could give their
26  business to any dealer. (SSUF No. 33)

27  Notably, as of September 1, 2006 E*Trade stopped giving business to Contract Associates
28  and from that point forward E*Trade did not enter into any more contracts with Contract Associates.

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

7.

1  E*Trade had the right to follow Ruiter wherever she went, even if she worked for a non-Teknion
2  dealer, and stayed with Ruiter because of her "performance and outstanding service." (SSUF No. 34)
3  In fact, *even if* Ruiter switched professions (if she sold copiers instead of furniture, for example)
4  E*Trade would *not* have done business with Contract Associates after September 1, 2006. (SSUF
5  No. 35)

6      Contract Associates does not quarrel with E*Trade's right to determine who it does business
7  with and concedes that E*Trade has the absolute right to give all of its business to Workspace
8  Solutions. (SSUF No. 36) Contract Associates also agrees that E*Trade had the right to decide
9  which furniture dealer would ultimately issue the purchase orders on the five projects that are the
10  subject of this action. (SSUF No. 37)

11      At the time Ruiter resigned from Contract Associates, E*Trade was contemplating five
12  projects.[2] However, there is no dispute that as of September 1, 2006, E*Trade was not contractually
13  obligated to Contract Associates (or any other dealer) concerning these five projects because no
14  signed purchase orders existed between E*Trade or Contract Associates. (SSUF No. 39) For
15  example: There is no dispute that E*Trade did not place a purchase order with Contract Associates
16  for the "Jersey City" project because the "lease fell through" (SSUF No 40; ); there is no dispute that
17  E*Trade did not place a purchase order with Contract Associates for the "Sandy, Utah 4th and 5th
18  Floor project" (SSUF No. 41); there is no dispute that E*Trade did not place a purchase order with
19  Contract Associates for the "Dulles" project (SSUF No. 42,); there is no dispute that E*Trade did not
20  place a purchase order with Contract Associates for the "Alpharetta" project (SSUF No. 43); and,
21  there is no dispute that E*Trade did not place a purchase order with Contract Associates for the
22  "Charlotte" project. (SSUF No. 44) Because no purchase order was ever signed by E*Trade and
23  Contract Associates on these five projects, Contract Associates is not entitled to any commissions or
24  profits. (Id.)

25  ///

26
27  [2]The five E*Trade projects that Contract Associates confirms it did not have a purchase order for are
     commonly referred to as (1) Sandy, Utah, 3rd and 5th floors; (2) Jersey City; (3) Alpharetta; (4)
28  Dulles; and (5) Charlotte. (SSUF No. 38)

1   Contract Associates inexplicably wants 100% (one hundred percent) of the commissions on
2   these five E*Trade projects even though there were no signed purchase orders and even though
3   E*Trade never paid any money to Contract Associates for Ruiter's preliminary work. E*Trade was
4   not obligated to pay Contract Associates because prior to terminating her employment in September
5   2006, Ruiter only prepared initial quotes, and in some instances did the initial design layouts, work
6   that could be accomplished in just a few hours. (SSUF No. 45) It is undisputed that unless and until
7   (1) a purchase order is signed by E*Trade and (2) E*Trade pays Contract Associates "in full",
8   neither Ruiter nor Contract Associates would be entitled to a commission or any compensation from
9   E*Trade for the preliminary work that Ruiter performed. No purchase orders were signed and no
10  monies were received on these five projects. (SSUF No. 46) Significantly, Contract Associates
11  acknowledged it has no right to compensation for the initial bids and layouts prepared by Ruiter for
12  E*Trade, evidenced by the fact that Contract Associates *never* sent an invoice for payment to
13  E*Trade or otherwise demanded any compensation from E*Trade for the preliminary work that
14  Ruiter performed. (SSUF No. 47)

15  Anticipating Mr. Antonelli would be upset and would deny Ruiter access to her computer
16  after giving notice of resignation, Ruiter copied personal and work-related files including E*Trade
17  files from her Contract Associates computer onto an external hard drive [3] Ruiter also deleted old job
18  files, personal files and email. (SSUF No. 48) Contract Associates paid a computer consultant $200
19  (two hundred dollars) to recover the files that Ruiter deleted. (SSUF No. 50)

20  ### III.   ARGUMENT

21  #### A.   Standard of Review

22  The party moving for summary judgment has both an initial burden of production (below)
23  and the ultimate burden of persuading the court that there is "no genuine issue of material fact and
24  that the moving party is entitled to judgment as a matter of law." (FRCP Rule 56(c)) The burden of
25  persuasion at trial is usually determined by the pleadings. Therefore, on a summary judgment
26  motion, the moving party must generally demonstrate there is no triable issue as to the matters

27

28  [3] After informing Mr. Antonelli that she was resigning, Ruiter was in fact denied access to the office.
(SSUF No. 49)

PALMER KAZANJIAN
WOHL PERKINS LLP
520 Capitol Mall, Suite 600
Sacramento, CA 95814
916.442.3552

alleged in its own pleadings; i.e., Contract Associates on a claim for relief or defendant on an affirmative defense. (Calderone v. United States, supra, 799 F2d at 259; Southern Calif. Gas Co. v. City of Santa Ana, supra 336 F3d at 888 (citing text))

**B.    Contract Associates Fails to Establish a Violation of the Computer Fraud and Abuse Act**

Contract Associates' first cause of action against Ruiter is an alleged violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (hereinafter "CFAA"). Contract Associates fails to establish that it sustained the minimum loss and/or damages required to maintain a cause of action; thus its claim must be dismissed.

Section 1030(g) of the CFAA provides Contract Associates a private right of action against a violator of the statute if Contract Associates suffers "loss" or "damage" by reason that the defendant's conduct involves the factors set forth in one of the clauses of 1030(a)(5)(B)(i)-(v). Presumably in this case, Contract Associates relies upon the conduct in subsection 1030(a)(5)(B)(i) and 1030(a)(5)(A)(iii), which provide that a violation occurs if the defendant intentionally accesses a protected computer without authorization, and as a result of such conduct, such access causes loss aggregating at least $5,000 in value to one or more persons during any 1 year period. (18 U.S.C. § 1030(a)(5)(B)(i), incorporating subsection 1030(a)(5)(A)(iii))

First, Contract Associates' claim fails because it cannot establish it sustained "loss" aggregating at least $5,000. (SSUF No. 51) Contract Associates appears to argue that the losses accrue based on the use of the information allegedly obtained from the computer, rather than actual loss as permitted by the statute. "Loss" is defined in section 1030(e)(11) to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." Contract Associates admits it paid a computer consultant $200 to restore data.

Contract Associates' attorney's fees are not recoverable under the CFAA. Assuming the Declaration of Ann Antonelli in support of Contract Associates' Opposition to Workspace Solution's Motion for Summary Judgment constitutes the extent of Contract Associates' proof of damages

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

10.

1    and/or loss for purposes of this cause of action, it is clear that Contract Associates impermissibly

2    seeks an award of attorney's fees in the amount of $35,000.00. Ruiter assumes this is an attempt to

3    characterize (albeit impermissibly) these fees as a "loss" under section 1030(e)(11).    Ruiter,

4    however, has found no case that would support the proposition that attorney's fees would be

5    recoverable as a "loss" under the CFAA.

6    Assuming, *arguendo,* that attorney's fees could be recoverable as a loss, they would

7    necessarily be limited to the type of loss permitted by the statute – loss "because of interruption of

8    service." Contract Associates provides nothing more than a conclusory allegation (set forth in Mrs.

9    Antonelli's Decl., ¶ 13) that these fees were incurred as a result of the deleted and copied files.

10   Certainly the $200 paid by Contract Associates to restore the data confirms there was no

11   "interruption of service" requiring tens of thousands dollars in attorney's fees. Contract Associates'

12   unsubstantiated conclusory allegations do not create an issue of material fact sufficient to defeat a

13   motion for summary judgment. (*Hansen v. U.S.,* 7 F.3d 137, 138 (9th Cir. 1993); *Tarin v. County of*

14   *Los Angeles,* 123 F.3d 1259, 1265 (9th Cir. 1997)(superseded by statute on separate legal ground))

15   Thus, Contract Associates fails to establish loss in excess of $200 in this matter.

16   Additionally, Contract Associates cannot establish "damages" as that term is defined by the

17   statutory scheme. The term "damage" is defined as "any impairment to the integrity or availability

18   of data, a program, a system, or information" (18 U.S.C. § 1030(e)(8)) by reason of a violation of

19   section 1030. (18 U.S.C. § 1030(g)) Thus, Contract Associates must establish a causal connection

20   between Ruiter's alleged violation of the statute and Contract Associates' claimed damages, a feat

21   that Contract Associates simply cannot do. (*Creative Computing v. Getloaded.com LLC,* 386 F.3d

22   930, 935-36 (9th Cir. 2004))

23   The facts of the case do not support the theory that Contract Associates sustained the

24   threshold of $5,000.00 in damages, much less the $915,471.00 it claims as damages in its Opposition

25   to Workspace Solution's Motion for Summary Judgment, due to violations of the CFAA. Even if

26   Ruiter did access the computer files without authority (which she did not), thereafter deleting old

27   files and copying other files for use in her new job, Contract Associates cannot establish that this

28   violation caused the complained of damages. It is undisputed that E*Trade's representative, Tom

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

11.

1   Gaffney, would have followed Ruiter to any new employer, irrespective of the documentation she

2   may have had in her possession. (SSUF Nos. 25, 52)  Thus, the evidence establishes that it was

3   Ruiter's act of leaving Contract Associates' employ, not the files that she took with her, that caused

4   Contract Associates to lose business.  Ruiter was an at-will employee entitled to leave Contract

5   Associates at any time, with or without notice to Contract Associates. (SSUF No. 53)  This act does

6   not establish a violation of the CFAA.   Thus, Contract Associates can prove no causal nexus

7   between its alleged damages and the alleged CFAA violation.

8           Moreover, Contract Associates estimates its damages to be $915,471.00, which is based upon

9   the following lone conclusory allegation in the Ann Antonelli Declaration: "Based on the limited

10  data available, Contract Associates estimates its damages at nine hundred fifteen thousand four

11  hundred seventy-one dollars ($915,471.00)."  This conclusion is not a factual basis for a finding of

12  damages and it is also inconsistent with the sworn testimony of Bob Antonelli who estimated the

13  damages at $500,000. (SSUF No 54)

14          The inconsistent testimony between the owners of Contract Associates and the conclusory

15  allegation in Ann Antonelli's Declaration demonstrates that Contract Associates simply cannot

16  determine a level of damages beyond mere speculation. (*Sebastian Intern., Inc. v. Russolillo*, 2005

17  WL 1323127, *9 (C.D. Cal.)(citing *Poppell v City of San Diego*, 149 F.3d 951, 954 (9th Cir.

18  1998)("mere speculation, intuition or guessing" does not constitute a valid inference and is

19  insufficient to allow the non-moving party to survive summary judgment, even though Court must

20  make all reasonable inferences in favor of non-moving party for purposes of summary judgment))

21  Thus, Ruiter's Motion for Summary Judgment, or in the alternative Adjudication, must be granted as

22  to the first cause of action

23      **C.      Contract Associates Cannot Establish a Prima Facie Case That Ruiter Breached
                 any Contracts**

24          Ruiter seeks summary adjudication of Contract Associates' Second Cause of Action because

25  Contract Associates cannot establish a prima facie case for breach of contract.  A prima facie case of

26  breach of contract requires that Contract Associates establish: 1) a contract; 2) Plaintiff's

27  performance or excuse of performance; 3) Defendant's breach; and 4) resulting damages. (*Love v*

28

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

12.

1   *Motion Industries, Inc.*, 309 F. Supp. 2d 1128, 1135 (N. D. Cal. 2004)) In this case, Contract

2   Associates fails to establish that Defendant Ruiter's alleged breach caused any damages and, further,

3   the damages alleged by Contract Associates are clearly too speculative.

### 1.   Ruiter's alleged breach did not damage Contract Associates.

5   Assuming *arguendo* that Ruiter did breach the Agreement, her breach did not cause Contract

6   Associates damage. Contract Associates alleges that Ruiter breached the Agreement by selling

7   products to and performing services for its clients while employed by Contract Associates but while

8   "secretly" working as an agent for Defendant Workspace Solutions. (Compl., ¶ 26) However,

9   damages for breach of contract must be as a proximate result of the alleged breach. (*EPIS, Inc. v.*

10   *Fidelity and Guaranty Life Ins. Co.*, 156 F. Supp. 2d 1116, 1127 (N.D. Cal. 2001)) "The test for

11   causation in a breach of contract...action is whether the breach was a substantial factor in causing

12   the damages." (*US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (2005)) Similar to the First

13   Cause of Action, Ruiter's alleged breach cannot be said to be a substantial factor in Contract

14   Associates' speculative damages claim.

15   Assuming Ruiter was "secretly" working for Defendant Workspace while employed by

16   Contract Associates, this act did not cause Contract Associates any damages. It is undisputed that

17   E*Trade was free to decide who it would give its business to and it is also undisputed that Contract

18   Associates had no contractual relationship with E*Trade that would ensure it future business. (SSUF

19   No. 55) On a project-by-project basis, E*Trade would decide which dealer it used to design and

20   supply its furniture needs. (SSUF No. 56) Moreover, E*Trade had full discretion to decide what

21   dealer would ultimately issue the purchase orders on the subject projects. (SSUF No. 57)

22   It is also undisputed, and Contract Associates concedes, that E*Trade was not required to

23   make any payments to Contract Associates on any projects, or to any other dealer, unless and until

24   there was a purchase order signed by the parties, which is also consistent with Contract Associates'

25   Commission Agreement. (SSUF No. 58) Furthermore, when a sales associate (such as Ruiter)

26   worked for a client (such as E*Trade) before a purchase order is s signed, and the sale ultimately did

27   not go through, Contract Associates would not receive any compensation. (SSUF No. 59) Thus,

28

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

13.

1   Contract Associates is contractually entitled to nothing from E*Trade until a purchase order is

2   signed no matter how much preliminary work Ruiter put into the project.

3       It is further undisputed that E*Trade's authorized representative, Mr. Gaffney, would have

4   given Ruiter the E*Trade business no matter where she worked. Mr. Gaffney specifically testified

5   that he would have given *all* E*Trade projects to Ruiter irrespective of whether she worked on the

6   projects before her move to Defendant Workspace Solution. (SSUF No. 60) The substantial factor

7   that caused Contract Associates to lose the E*Trade work was Ruiter's change of employment,

8   which was permissible since it is undisputed that she was an at-will employee. Thus, it cannot be

9   said that Ruiter's alleged secret work for Workspace Solutions was a factor (let alone the requisite

10  "substantial factor') in Contract Associates' alleged speculative damages. (*See, e.g., National*

11  *Medical Transportation Network v. Deloitte & Touche*, 62 Cal. App. 4th 412, 438 (1998)(holding no

12  causation when plaintiff alleged breach of contract by retaining defendant auditors to issue an

13  opinion that plaintiff intended to use to encourage a third party to invest in plaintiff's business,

14  which auditors failed to issue the opinion and the third party did not invest in plaintiff's business);

15  *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 910 (2005)(holding defendant's breach not a

16  substantial factor in causing plaintiff Associates damages because it was not reasonably certain that

17  the federal government would have transferred certain property to the State of California (a

18  prerequisite to performance) had it used its best efforts to acquire the property)).

19          **2.    Contract Associates' Alleged Contract Damages Are Speculative**

20      Apparently, Contract Associates claims damages for breach of contract in the amount of

21  $915,471.00, which is based upon the unsupported and conclusory allegation in the Ann Antonelli

22  Declaration (*supra*). As with the First Cause of Action, this figure is purely speculative and cannot

23  defeat a motion for summary judgment. (*Wiz Technology, Inc. v. Coopers & Lybrand*, 106 Cal. App.

24  4th 1, 15 (2003) ["Summary judgment will be upheld where the plaintiff's evidence is little more

25  than guesswork "in the realm of mere speculation and conjecture."(citation omitted)]; *Sebastian

26  Intern., Inc v. Russolillo*, 2005 WL 1323127, *9 (C.D. Cal.)(citing *Poppell v. City of San Diego*, 149

27  F.3d 951, 954 (9th Cir. 1998)["mere speculation, intuition or guessing" does not constitute a valid

28  inference and is insufficient to allow the non-moving party to survive summary judgment, even

14

1   though Court must make all reasonable inferences in favor of non-moving party for purposes of
2   summary judgment])   As discussed previously, Ms Antonelli's unsupported "estimate" is also
3   inconsistent with her husband's deposition testimony.

4       Contract Associates' only "evidence" of alleged damages is the self-serving declaration,
5   which consists entirely of inadmissible guesswork and unsupported conjecture, mandating summary
6   judgment against Contract Associates. (*Wiz Technology, Inc*, 106 Cal. App. 4th at 16)

7       **D.    Summary Adjudication on Contract Associates' Breach of the Implied Covenant
            of Good Faith and Fair Dealing is Appropriate**
8
9               **1.    Tort Damages are Not Available to Contract Associates for an Alleged
                    Breach of the Implied Covenant of Good Faith and Fair Dealing**

10      To state a valid claim for breach of the implied covenant of good faith and fair dealing for the
11  recovery of tort damages, Contract Associates must show that a special relationship exists between
12  the parties to the contract. (*Ashton-Tate Corp v. Ross*, 728 F. Supp. 597, 604 (N.D. Cal. 1989))
13  "Such a 'special relationship' exists only when all the following factors are present in a contract:  (1)
14  inherently unequal bargaining positions; (2) non-profit motivation for entering the contract; (3)
15  ordinary contract damages are not adequate; (4) one party is especially vulnerable; and (5) the other
16  party is aware of this vulnerability." (*Id*, at 604)  The third prong is typically met when ordinary
17  contract damages do not require the party in the superior position to account for its actions or they do
18  not make the inferior party whole. (*Id.*)

19      As is evident from the *Foley v. Interactive Data Corp.* case, the implied covenant of good
20  faith and fair dealing does not automatically extend in the employment contract context. (*Foley v*
21  *Interactive Data Corp*,  47 Cal. 3d 654 (1988)("After review of the various commentators, and
22  independent consideration of the similarities between the [insurer/insured and employer/employee]
23  areas, we are not convinced that a 'special relationship' analogous to that between insurer and
24  insured should be deemed to exist in the usual employment relationship which would warrant
25  recognition of a tort action for breach of the implied covenant."))  Looking at the specific facts of
26  this case, there was no "special relationship" between Ruiter and Contract Associates; thus tort
27  damages for an alleged breach of the implied covenant of good faith and fair dealing are not
28  available.

1    The special relationship required for this cause of action is lacking in several respects. First,
2    the Ruiter and Contract Associates were not in an inherently unequal bargaining position. Second,
3    ordinary contract damages would be adequate to deter Ruiter not to breach the agreement. Finally,
4    neither party is particularly vulnerable to the other. It is undisputed that the employment contract
5    upon which this cause of action is based was negotiated by both parties. Contract Associates admits
6    that in May 2006, at Ruiter's request, she was paid on a commission-only basis, receiving 40% of all
7    net profits but only when (and if) Contract Associates is "paid in full." (SSUF No. 62) There is no
8    evidence that Contract Associates could not control the terms of the agreement – Ruiter did not
9    submit a standardized form of employment contract and there was room for bargaining as to special
10   conditions. Thus, there simply was no unequal bargaining position in relation to the agreement.
11   Neither Contract Associates nor Ruiter were placed in a "take it or leave it" situation in negotiating
12   the contract. (*Id.*) Thus, the special relationship fails on this ground alone. (*Ashton-Tate Corp.*, 728
13   F. Supp. at 605 (finding that all five factors must be present to create a special relationship))

14       Second, ordinary contract damages would be adequate to deter Ruiter not to breach the
15   agreement; thus, the special relationship fails for this reason. If proven, a breach of the agreement
16   by Ruiter would expose her to damages for lost profits. And, in fact, Contract Associates seeks
17   recovery of lost profits for this cause of action. Thus, this ordinary remedy for breach of contract
18   would make Contract Associates whole. (*Ashton-Tate Corp.*, 728 F. Supp. at 605 (holding no special
19   relationship where foreseeable lost profits recoverable under breach of contract claim making
20   contract damages adequate)) Therefore, the special relationship fails on this ground as well.

21       Finally, neither party is vulnerable to the other as was contemplated by the courts in creating
22   this tort claim. Breach of the implied covenant of good faith and fair dealing arose in the insurance
23   context. As such, the level of vulnerability required for one of the parties is fairly extreme. The
24   California Supreme Court has found that in the employment context, "the employee is not in the
25   same economic dilemma that an insured faces when an insurer in bad faith refuses to pay a claim or
26   to accept a settlement offer within policy limits . . ." When an insurer takes such actions, the insured
27   cannot turn to the marketplace to find another insurance company willing to pay for the loss already
28   incurred. The wrongfully terminated employee, on the other hand, can (and must, in order to

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

16.

1   mitigate damages…) make reasonable efforts to seek alternative employment.'" (*Foley*, 47 Cal. 3d

2   654, 691 (1988)(citation omitted)) There is no evidence that Ruiter was vulnerable as is required to

3   establish the special relationship. Moreover, there is no evidence indicating that Contract Associates

4   was vulnerable. Thus, there was no special relationship between Contract Associates and Ruiter;

5   thus, tort damages are not available in this instance.

6   ### 2.   Ruiter Did not Breach the Implied Covenant of Good Faith and Fair Dealing

7           The covenant of good faith and fair dealing is implied in all contracts to prevent one party

8   from engaging in conduct that frustrates the other party's rights to the benefits of the agreement.

9   (*Thompson Pacific Const., Inc. v. City of Sunnyvale*, 155 Cal. App. 4th 525, 541 (2007)) Where the

10  party's breach of the covenant does not sound in tort, as in the present case, "the action is just

11  'another "garden variety breach of contract" action for which only contract damages may be

12  recovered.'…As in any contract action, "'[i]t is essential to establish a causal connection between

13  the breach and the damages sought.'" (*Id.* (citations omitted))

14          As with the other alleged causes of action, Contract Associates cannot establish the requisite

15  causal connection between the breach and the damages it seeks. Contract Associates alleges that

16  Ruiter breached the covenant of good faith and fair dealing by concealing from Contract Associates

17  the existence of the five E*Trade projects that ultimately followed her to Workspace Solutions.

18  (Compl., ¶ 34) The only objectionable conduct here is the alleged concealment of the five projects

19  and transferring them to her new employer.[4] Yet, Contract Associates cannot show that Ruiter's

20  alleged concealment of the projects caused the alleged damage because E*Trade, and not Contract

21  Associates, had the absolute right to choose who it wanted to work with on these five projects.

22          "The test for causation in a breach of contract…action is whether the breach was a

23  substantial factor in causing the damages." (*US Ecology, Inc. v. State,* 129 Cal. App. 4th 887, 909

24  (2005)) Like the other claims, Ruiter's alleged conduct cannot be said to be a substantial factor in

25  Contract Associates' speculative damages claim.

26  _____

27  [4]   Ruiter's resignation from her position cannot be the basis of a breach of the covenant of good faith and fair dealing because she was an at-will employee. The covenant will not limit a party's

28  express rights under the contract. (*See., e.g., Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 351 (2000))

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

17.

1        Assuming Defendant Ruiter had concealed the existence of the E*Trade projects[5] and
2  transferred them once she quit, this act did not cause Contract Associates any damages.   It is
3  undisputed that E*Trade was free to decide who it gave business to and that Contract Associates had
4  no contractual relationship with E*Trade that would ensure it future business. (SSUF No. 63)  On a
5  project-by-project basis, E*Trade would decide which dealer it used to design and supply its further
6  needs.  E*Trade had full discretion to decide what dealer would ultimately issue the purchase orders
7  on the subject projects.  It is further undisputed that E*Trade's representative, Mr. Gaffney, would
8  have given Ruiter the E*Trade business regardless of where she worked.  Mr. Gaffney was the
9  E*Trade representative empowered to decide which dealer it used.  Mr. Gaffney testified that he
10 would have given the projects to Defendant Ruiter irrespective of whether she worked on the
11 projects before her move to Defendant Workspace. (SSUF No 64)

12       It is also undisputed that E*Trade was not required to make any payments to Contract
13 Associates on any projects, until it signed and sent in a purchase order. (SSUF No. 65)  Furthermore,
14 when a sales associate (such as Ruiter) worked for a client (such as E*Trade) *before* a purchase
15 order was signed, and the sale ultimately did not go through, the dealer (such as Contract Associates)
16 and the sales associate would receive no compensation because both were working on a commission
17 basis pursuant to the express terms in the Commission Agreement. (SSUF No 66)  Thus, Contract
18 Associates is contractually entitled to nothing from E*Trade until and unless a purchase order is
19 signed no matter how much work Ruiter put into the project.

20       The substantial factor that caused Contract Associates to lose the E*Trade work was that
21 Defendant Ruiter changed employment, which was permissible since it is undisputed that she was an
22 at-will employee.   Thus, it cannot be said that Defendant Ruiter's alleged concealment of the
23 E*Trade projects and transfer of them after she quit was a substantial factor in Contract Associates'
24 alleged speculative damages. (*See, e.g., National Medical Transportation Network v. Deloitte &*
25 *Touche, supra,* 62 Cal. App. 4th 412, 438; *US Ecology, Inc. v. State, supra,* 129 Cal. App. 4th 887,

26

27 _____
5       The idea that Ruiter was concealing projects from Contract Associates is absurd.   The
preliminary quotes and space specifications was created using Contract Associates' computer and
28 files.  There was no secret spot that Ruiter placed the files.  If Contract Associates had asked Ruiter
about the projects she was working on, Ruiter would have told them.

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

910) Thus, summary judgment or, in the alternative, adjudication on the breach of the implied covenant of good faith and fair dealing is appropriate.

### E. Contract Associates' Count for Breach of Duty of Loyalty Must Fail

Contract Associates' characterization of Ruiter's actions as the basis for its breach of the duty of loyalty claim is supported by incorrect facts that do not give rise to a breach. If her actions did, however, violate a duty of loyalty, Contract Associates' alleged damages were not caused by this breach.

Contract Associates speciously claims that Ruiter breached her duty of loyalty by working for her own interest and that of Workspace Solutions in May 2006 until her resignation in September 2006, by withholding information about projects she worked on and by transferring those projects to Workspace Solutions. (Compl. ¶ 38)

However, it is undisputed that although Ruiter began considering leaving Contract Associates as early as May of 2006, she did not begin discussing the possibility of moving to Workspace Solutions until mid-August 2006. In fact, there is no dispute that Ruiter's first conversation of any kind with Ms. Gillen took place in August 2006, not prior. Ruiter tendered her resignation a few weeks later on September 1, 2006 and around that time she began making preparations to transfer projects and other files to her new employer. (SSUF No. 67) Ruiter has the right to make preparations to enter into competition with a former employer. (*Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 346 (1966)) The nature and character of the acts performed determine if there is an actionable wrong. And, ultimately, it is whether the action performed actually causes some particular injury to the former employer. (*Id.*)

Nothing Ruiter did, or did not do, caused Contract Associates any damages. As with every other cause of action, there's no causal nexus between the alleged wrongful acts and the reason Contract Associates lost the E*Trade business. It is undisputed that the E*Trade decision maker, Tom Gaffney, would have pulled the E*Trade work from Contract Associates if Ruiter left its employ – even if she decided to go into an entirely different profession. (SSUF No. 68) The only way Contract Associates would have retained the E*Trade business on the allegedly five "secret" projects would have been if Ruiter continued working for Contract Associates. (*Id.*) There is no

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

19.

1  dispute that as soon as Ruiter resigned from Contract Associates, E*Trade would not give Contract

2  Associates any more business. And since Ruiter was an at-will employee, she could leave Contract

3  Associates at any time. (SSUF No. 68) It is also undisputed that when Contract Associates learned

4  of the five E*Trade projects, it contacted E*Trade in an attempt to convince it to continue its

5  business relationship with Contract Associates.    Contract Associates admits that this was

6  unsuccessful. E*Trade only wanted to work with Ruiter. Thus, Contract Associates' claim fails and

7  summary judgment is appropriate.

8  
**F.     Ruiter did not Tortiously Interfere with an Economic Relationship or
         Prospective Economic Advantage between Contract Associates and E*Trade**

9  
10         "The tort of intentional or negligent interference with prospective economic advantage

imposes liability for improper methods of disrupting or diverting the business relationship of another

11  which fall outside the boundaries of fair competition." (*Settimo Associates v. Environ Systems, Inc.*,

12  14 Cal. App. 4th 842, 845 (1993)) In order to prove such a claim, Contract Associates must establish

13  "(1) an economic relationship between Contract Associates and some third party, with the

14  probability of future economic benefit to the Contract Associates; (2) the defendant's knowledge of

15  the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship;

16  (4) actual disruption of the relationship; and (5) economic harm to the Contract Associates

17  proximately caused by the acts of the defendant.'" (*Westside Center Associates v. Safeway Stores 23,*

18  *Inc.*, 42 Cal. App. 4th 507, 521-22 (1996)((citations omitted)) The defendant's act to interfere must

19  be wrongful by some legal measure independent of the interference itself. (*Della Penna v. Toyota*

20  *Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995)) "An act is wrongful if it is unlawful, that is,

21  if it is proscribed by some legal measure, rather than merely a product of an improper, but lawful,

22  purpose or motive." (*San Jose Construction, Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1545

23  (2007)) What Contract Associates fails to recognize is Ruiter's change of jobs, not any other act, is

24  what ended the prospective relationship it could have had with E*Trade.

25         It is undisputed that Contract Associates had no contractual relationship with E*Trade that

26  ensured it future business. (SSUF No. 70) On each project, E*Trade could, and often did, decide

27  what company to use to design and supply its furniture needs. It is also undisputed that after Ruiter

28  

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

20.

1   left, she continued to work for Contract Associates on the three E*Trade projects that were

2   contractually obligated to Contract Associates.  In regards to the five E*Trade projects at issue,

3   E*Trade had full discretion and the absolute right to move those projects to any other dealer *before* a

4   purchase order was signed.  Contract Associates concedes that it did not have a signed purchase

5   order on any of the five projects E*Trade projects. (SSUF No. 71)

6       The only action that Contract Associates, in good faith, can tie to the loss of the business

7   relationship with E*Trade is Ruiter's change of jobs.  However, Mr. Gaffney testified that he would

8   have pulled E*Trade's business from Contract Associates on the projects that were not under a

9   signed purchase order as soon as Ruiter left Contract Associates' employ – whether or not she

10  moved to Workspace Solutions.  There is nothing wrongful about Ruiter leaving her at-will job

11  because she was permitted as a matter of law to quit that job at any time.  Thus, Contract Associates'

12  claim for intentional interference with prospective economic relations fails and summary judgment,

13  or in the alternative adjudication, is proper.

14  **G.    Contract Associates' Claim for Conversion Fails because Contract Associates had no Property Interest in the Five E*Trade Projects**

15      In Count VII, Contract Associates alleges that Ruiter and Workspace Solutions wrongfully

16  converted its projects for personal financial gain. (Compl., ¶ 55)  However, in order to succeed on a

17  conversion claim, Contract Associates must prove that it had an ownership interest or a right to

18  possession of the property. (*PCO, Inc. v Christensen, Miller, Fink, Jacobs, Glaser, Weit & Shapiro,*

19  *LLP,* 150 Cal. App. 384, 395 (2007))  Because Contract Associates neither has title to the property

20  alleged to have been converted, nor possession thereof, it cannot maintain an action for conversion.

21  (*Fischer v. Machado,* 50 Cal. App. 4th 1069, 1072 (1996))

22      Here, Contract Associates clearly had no ownership interest in the projects with E*Trade nor

23  right to possession of them.  It is undisputed that E*Trade was free to give its business to any dealer

24  and that Contract Associates had no contractual relationship with E*Trade that would ensure it

25  future business.  On a project-by-project basis, E*Trade would decide which dealer it used to design

26  and supply its further needs. (SSUF No. 72)  Moreover, E*Trade had full discretion to decide what

27  dealer would ultimately issue the purchase orders on the subject projects (SSUF No. 73)

28

1   Despite Contract Associates' artful pleading, it really seeks the money paid by E*Trade to
2   Ruiter on these five projects, not the projects themselves. As was stated in *Korea Supply Co.*, "an
3   attenuated expectancy cannot ...be likened to 'property' converted by [Defendant] that can now be
4   the subject of a constructive trust." (*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134,
5   1150 (2003)) Thus, summary judgment, or in the alternative adjudication, as to the Contract
6   Associates' conversion claim is proper.

7   **H.     Ruiter's Allegedly Deceitful Conduct did not Damage Contract Associates**

8   In order to establish a claim for deceit, Contract Associates must prove, among other things,
9   that the damage is caused by the misrepresentations or concealment. (*Williams v. Wraxall*, 33 Cal.
10  App. 4th 120, 131-32 (1995)) "A 'complete causal relationship' between the fraud or deceit and
11  damages suffered by Contract Associates is required." (*Id.* at 132 (citations omitted); *see, e.g., Hill v.*
12  *Wrather*, 158 Cal. App. 2d 818, 824 (1958)(no causal connection between alleged concealment and
13  alleged damages)) As in the other claims, causation requires proof that the defendant's deceitful
14  conduct was a "substantial factor" in bringing about Contract Associates' damage. (*Id.*) "A plaintiff
15  cannot recover damages based upon speculation or even a mere possibility that the wrongful conduct
16  of the defendant caused the harm." (*Id.*) In this instance, Ruiter's allegedly deceitful behavior (i.e.,
17  not disclosing the five E*Trade projects upon her resignation) was not a substantial factor in
18  bringing about Contract Associates' alleged harm; it is mere speculation. Thus, summary judgment,
19  or in the alternative adjudication on the eighth cause of action for Deceit is appropriate.

20  In its claim for Deceit, Contract Associates alleges that Ruiter was somehow obligated to
21  disclose information regarding the existence of, and her work on, the five E*Trade projects.
22  (Compl., ¶ 60) Contract Associates further alleges that Ruiter failed to disclose the existence of
23  these projects, actively concealing them until after her resignation, which damaged Contract
24  Associates, presumably in the amount of $915,471.00. (Compl., ¶¶ 62 -- 64) However, there is no
25  dispute that Contract Associates never asked Ruiter about potential future projects with E*Trade and
26  thus she never concealed anything. In fact, there was nothing to disclose because as of September 1,
27  2006 E*Trade was not contractually obligated to Contract Associates (or any other dealer)
28  concerning these five projects because no signed purchase orders existed between E*Trade or

PALMER KAZANJIAN
WOHL PERKINS LLP
520 CAPITOL MALL, SUITE 600
SACRAMENTO, CA 95814
916.442.3552

1    Contract Associates.  Moreover, Mr. and Mrs. Antonelli had Ruiter's computer log-on identification

2    and password and they were able to monitor the jobs she worked on and the email she received.

3    (SSUF No. 74)

4        Again, Contract Associates cannot establish any sort of colorable argument that Ruiter's

5    alleged "deceit" was a substantial factor in Contract Associates' alleged damages. (*Williams*, 33 Cal.

6    App. 4th at 132)  Contract Associates was merely clinging to an expectancy of getting more work

7    from E*Trade, including the five projects that E*Trade awarded to Ruiter and Workspace Solutions.

8    However, there is no dispute that no matter what Contract Associates did, E*Trade was not going to

9    award it with any business after Ruiter's departure on September 1, 2006. (SSUF No. 75)  Because

10   there is no causal nexus between Ruiter's alleged concealment and the reason Contract Associates

11   lost the E*Trade business, its claim for Deceit must fail and summary judgment or in the alternative

12   adjudication as to this claim, is appropriate.

13       **I.    Summary Adjudication is Proper on Contract Associates' Claim for Unfair**
         **Competition**

14       Contract Associates' ninth Count seeks restitution and disgorgement of the interest in the

15   money gained by Ruiter and Workspace Solutions and a disgorgement of all profits gained by Ruiter

16   and Workspace Solutions through their alleged unlawful and unfair business practices. (Compl., ¶¶

17   67 – 72)  As a matter of law, however, Contract Associates is not entitled to restitution or

18   disgorgement under the statute because Contract Associates held no ownership interest in the money

19   sought to be returned.

20       An action under the Unfair Competition Laws ("UCL") in California is equitable in nature;

21   damages are not recoverable. (*Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992))

22   Thus, Contract Associates' remedies under the UCL are limited.  The remedies sought by Contract

23   Associates in this action are barred because the California Supreme Court has held that restitution

24   and disgorgement are not available to individual private plaintiffs in cases where the plaintiff had no

25   ownership interest in the money sought to be returned. (*Korea Supply Co. v. Lockheed Martin Corp.*,

26   29 Cal. 4th 1134 (2003))

27       The issue in *Korea Supply Co.* is similar to the instant case and its legal conclusions directly

28

1    on point.  In *Korea Supply Co.*, plaintiff Korea Supply Co. (KSC) was engaged in representing

2    manufacturers of military equipment in transactions with the Republic of Korea.  In the mid-1990s,

3    it represented a Canadian company in its bid to obtain the contract for an SAR system for use by the

4    military.  If the Canadian company's bid was awarded, KSC expected a commission of 15% (fifteen

5    percent) of the contract price.  In 1996, Korea awarded the bid to an American company even though

6    the Canadian company's bid was about $50 million lower and their equipment was found to be far

7    superior to that of the American competitor.  After a later investigation, it was revealed that the

8    contract was awarded to the American competitor because its procurement agent had bribed and

9    extended sexual favors to the ultimate decision maker.

10   KCS sued claiming the contract was secured by wrongful means, causing KCS severe loss

11   and that defendants had been unjustly enriched.  Thus, KCS sought disgorgement of the profits

12   realized based on the UCL and sought damages for the loss of its expected compensation from the

13   Canadian company.  The Supreme Court, in overturning the Court of Appeals decision, held that a

14   plaintiff may only recover profits unfairly obtained to the extent that these profits represent monies

15   given to the defendant or benefits in which the plaintiff has an ownership interest.  (*Korea Supply

16   Co.*, 29 Cal. 4th at 1148)

17   In finding that KCS had no ownership interest in the money it sought from defendants, it

18   noted that the profits realized by defendants were not money or property that was once in KCS'

19   possession.  Similarly, KCS had not given any money to defendant, rather the Republic of Korea

20   provided defendants with the money.  Thus, any award to KCS would not be restitutionary as it

21   would not replace any money or property defendants took from KCS.  (*Id.* at 1149.)

22   Further, the court found that there was no alternative restitutionary theory available to KCS

23   because it had no vested interest in the money it sought to recover.  Rather, KCS merely had an

24   "expectancy" in the receipt of a commission.  KCS' expected commission was merely a contingent

25   interest since KCS only expected payment if the Canadian company was awarded the contract.  (*Id.*

26   at 1149-50.) These interests could not be likened to property for restitutionary purposes. (*Id.*)  Thus,

27   KCS's claim under the UCL was dismissed because the UCL does not support nonrestitutionary

28   disgorgement remedies. (*Id.* at 1150-51.)

PALMER KAZANJIAN
WOHL PERKINS LLP
520 Capitol Mall, Suite 600
Sacramento, CA 95814
916.442.3552

24.

1   The instant case presents a similar situation. Contract Associates had no direct ownership

2   interest in the profits on the E*Trade projects. The money was never in Contract Associates'

3   possession and Contract Associates had not given Ruiter any of the money sought. (SSUF No. 76)

4   The alternative restitutionary theory is equally unavailable – Contract Associates' interest in the

5   profits was a mere "expectancy" that never came to fruition. It is undisputed that unless and until a

6   purchase order is signed by E*Trade, there is no contract and as a result neither Ruiter nor Contract

7   Associates would be entitled to a commission or any compensation for the preliminary work that

8   Ruiter performed. Contract Associates would only have been entitled to a commission if E*Trade

9   signed and sent in a purchase order for the jobs. (SSUF No. 77) Thus, Contract Associates has no

10   ownership interest in the profits Ruiter made on the projects and its UCL claim fails, entitling Ruiter

11   to summary judgment, or in the alternative adjudication on this cause of action.

12                                   **IV.   CONCLUSION**

13   Ruiter was an "at-will" employee and had the indisputable right to terminate her employment

14   with Contract Associates and thereafter take a position with Workspace Solutions. In her written

15   resignation Ruiter offered to complete projects (including the three E*Trade projects) to the financial

16   benefit of Contract Associates. Only after Contract Associates learned that Teknion steered Ruiter

17   to Workspace Solutions (another Teknion dealer) did Contract Associates cry foul and demand

18   restitution. However, as Contract Associates concedes and as evidenced by its Commission

19   Agreement, commissions on these five projects were not due unless and until (1) signed purchase

20   orders were in place (which they were not) and (2) E*Trade paid Contract Associates "in full" for

21   each of these projects (which never happened). Because these conditions precedent never occurred,

22   Contract Associates has no right to payment from anyone.

23   It is undisputed that Contract Associates has no colorable damage claim under any of its legal

24   theories because (1) E*Trade was free to decide which dealer would get its business (2) Contract

25   Associates had no contractual relationship with E*Trade that would ensure it future business, and (3)

26   E*Trade would not have given any projects to Contract Associates after Ruiter departed in

27   September 2006. As such, Contract Associates cannot establish a causal nexus between Ruiter's

28   alleged wrongful conduct and any alleged damages. Therefore, summary judgment, or in the

PALMER KAZANJIAN
WOHL PERKINS LLP
520 Capitol Mall, Suite 600
Sacramento, CA 95814
916.442.3552

25.

1   alternative adjudication of Contract Associates' tort and contract claims set forth in Counts 2, 3, 4, 6,

2   7, 8, and 9 is required.

3          Lastly, because Contract Associates concedes it only paid $200 to its computer consultant to

4   restore the data Ruiter deleted, its claim under the CFAA fails because Contract Associates clearly

5   cannot establish it sustained a "loss" aggregating at least $5,000.  Further, even if Ruiter did access

6   the computer files without authority (which she did not), thereafter deleting old files and copying

7   other files for use in her new job, Contract Associates cannot establish that this violation caused the

8   complained of damages because it is undisputed that E*Trade would have followed Ruiter to any

9   new employer, irrespective of the documentation she may have had in her possession.    Thus,

10  summary judgment, or in the alternative adjudication of Contract Associates statutory claim set forth

11  in Count 1 is required.

12         Based on the foregoing, Ruiter therefore requests an order granting Summary Judgment or,

13  alternatively, Summary Adjudication.

14

    Dated: May 15, 2008                            PALMER KAZANJIAN WOHL PERKINS LLP
15

16

17                                                 By: _____
                                                       Christopher F. Wohl
18                                                     Treaver K. Hodson
                                                       Jennifer L. McQuarrie,
19                                                     Attorneys for Defendant/Cross-Claimant
                                                       LETITIA RUITER
20

21

22

23

24

25

26

27

28

PALMER KAZANJIAN
WOHL PERKINS LLP
520 Capitol Mall, Suite 600
Sacramento, CA 95814
916.442.3552

26.